Harmeet K. Dhillon (CA Bar No. 207873)
harmeet@dhillonlaw.com
Gregory R. Michael (CA Bar No. 306814)
gmichael@dhillonlaw.com
Dorothy C. Yamamoto (CA Bar No. 306817)
dorothy@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108
415-433-1700
415-520-6593 (fax)

Thomas Brejcha, *pro hac vice pending*
tbrejcha@thomasmoresociety.org
Peter Breen, *pro hac vice pending*
pbreen@thomasmoresociety.org
THOMAS MORE SOCIETY
309 W. Washington St., Ste. 1250
Chicago, IL 60606
Tel: (312) 782-1680

*Attorneys for Plaintiffs the Center for Medical
Progress and David Daleiden*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE CENTER FOR MEDICAL PROGRESS, a California corporation, and DAVID DALEIDEN, an individual,<br><br>        Plaintiffs,<br><br>    vs.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of California; PLANNED PARENTHOOD FEDERATION OF AMERICA, a New York corporation; PLANNED PARENTHOOD AFFILIATES OF CALIFORNIA, a California corporation; NATIONAL ABORTION FEDERATION, | Case No.<br><br>**COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

a Missouri corporation; STEMEXPRESS, a
California LLC; KAMALA HARRIS, an
individual; JILL HABIG, an individual;
BETH PARKER, an individual; BRIAN
CARDWELL, an individual; REYE DIAZ,
an individual; and DOES 1 through 10,
inclusive,

                    Defendants.

## JURISDICTION AND VENUE

1. This action arises under 42 U.S.C. § 1983; 42 U.S.C. § 1985(3); 42 U.S.C. § 1986, and the Supremacy Clause of the United States Constitution found at Article VI, Clause 2.

2. Federal question jurisdiction is conferred on this Court under 28 U.S.C. § 1331.

3. This action's claims for damages, declaratory, and injunctive relief are all authorized by 42 U.S.C. §§ 1983, 1985, and 1986. Declaratory and injunctive relief are also authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court. Attorneys' fees and costs are authorized by 42 U.S.C. § 1988.

4. Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events that gave rise to this action's claims occurred in this judicial district.

## INTRODUCTION

5. This complaint seeks justice for a brazen, unprecedented, and ongoing conspiracy to selectively use California's video recording laws as a political weapon to silence disfavored speech. David Daleiden became the first journalist ever to be criminally prosecuted under California's recording law, not because of the *method* of video recording he utilized in his investigation—which is common in investigative journalism in this state—but because his investigation revealed and he published "shock[ing]" *content* that California's Attorney General and the private party co-conspirators wanted to cover up. Defendants seek their "pound of flesh" from Mr. Daleiden and to chill other journalists from investigating and reporting on that same content.

6. This "shocking" content included video footage of leadership at Planned Parenthood Federation of America (PPFA), PPFA's affiliates, and their fetal tissue trade partners StemExpress and others making multiple shocking and callous

admissions about exchanging fetal body parts for money on a per-specimen basis, sometimes using special abortion techniques to deliver living fetuses as intact as possible for harvesting, and knowingly blessing these practices at the highest levels of the professional abortion industry, despite federal and state laws forbidding these activities.

7.      The Center for Medical Progress (CMP) captured these admissions through its undercover journalistic investigations, reported its findings to law enforcement, and then began to release the videos to the public in July 2015. The videos prompted two comprehensive, year-long Congressional investigations, one at the Senate Judiciary Committee and one at the House Energy & Commerce Committee's Select Investigative Panel. These two nationwide investigations reviewed tens of thousands of pages of primary source documents and conducted hundreds of hours of witness interviews, ultimately issuing dozens of criminal and regulatory referrals for PPFA, its affiliates, and its business partners in the fetal tissue trade to local, state, and federal law enforcement.

8.      After CMP published its videos, Defendants met in secret with Kamala Harris in her individual capacity and in her capacity as the California Attorney General, seeking her aid in preventing further investigations of their fetal body parts trade and conspiring to silence the reporting of Mr. Daleiden and CMP by orchestrating the first and only prosecution of a journalist under California's video recording law, as well as creating new legislation with the intent to chill future speech containing similar investigations and messages that Mr. Daleiden and CMP pioneered.

9.      Defendants' actions violated and continue to violate Mr. Daleiden's and CMP's free speech rights and Equal Protection rights under the First and Fourteenth Amendments. Mr. Daleiden and CMP bring this current action to hold accountable the private parties at Planned Parenthood, NAF, and elsewhere who spearheaded these constitutional violations, and Mr. Daleiden and CMP seek declaratory and

injunctive relief in order to vindicate the First Amendment rights of all Americans and ensure that Defendants are held to account for their discriminatory and invidious abuse of laws.

## PARTIES

10.     Plaintiff David Daleiden is a citizen journalist with more than a decade of experience in conducting investigative research on the abortion industry. In 2013, Mr. Daleiden started the Center for Medical Progress (CMP) to pursue sophisticated, deep, and impactful investigative journalism projects pertaining to contemporary bioethical issues. Mr. Daleiden developed and executed the organization's first major initiative, the 30-month-long "Human Capital Project" investigation, documenting the illegal sale of human fetuses and their organs and tissues from abortions involving Planned Parenthood, the National Abortion Federation, StemExpress, and other organizations. Daleiden is a resident of Orange County, California.

11.     Plaintiff CMP is a 501(c)3 non-profit organization based in Orange County, California. The organization consists of a group of citizen journalists dedicated to monitoring and reporting on medical ethics and advances. CMP opposes any interventions, procedures, and experiments that exploit the unequal legal status of any class of human beings. CMP envisions a world in which medical practice and biotechnology ally with and serve the goods of human nature and do not destroy, disfigure, or work against them.

12.     Defendant Xavier Becerra is the current Attorney General of the State of California, and in that capacity leads the California Department of Justice. Becerra is sued only in his official capacity.

13.     Defendant Planned Parenthood Federation of America (PPFA) is the largest provider of abortion services in America. PPFA is the parent organization that oversees approximately 49 affiliated franchises across the country, all of which are required by PPFA to perform abortions. In 2018, the most recent year for which numbers are available, the Planned Parenthood organization reported 345,672

abortions, approximately 40% of the total abortions performed in the United States. PPFA is a 501(c)(3) organization headquartered in New York and receives taxpayer funding.

14.     Defendant Planned Parenthood Affiliates of California (PPAC) is the umbrella group for the seven Planned Parenthood franchises located in California. PPAC is a 501(c)(4) advocacy public policy, lobbying, and advocacy group, headquartered in California.

15.     Defendant Beth Parker is General Counsel for several California Planned Parenthood affiliates, and through early 2018, was the Chief Legal Counsel of Defendant PPAC. Parker is a resident of California.

16.     Defendant National Abortion Federation (NAF) is a membership-based trade organization for abortion providers. NAF members collectively provide 50% of the abortions performed nationwide. NAF members include individuals, Planned Parenthood affiliates, and independent abortion networks or clinics. Approximately 50% of NAF's Board of Directors and membership consists of Planned Parenthood representatives and affiliates. Every year, NAF hosts a large tradeshow for its members. NAF is a 501(c)(3) organization incorporated in Missouri and headquartered in Washington, D.C.

17.     Defendant StemExpress, LLC (StemExpress) is a human tissue and biologics procurement company that buys and transfers aborted human fetuses and their organs and tissues for valuable consideration. Since its founding in 2010, StemExpress has purchased and transferred aborted fetal tissue for valuable consideration from multiple Planned Parenthood affiliates, including affiliates of Defendant PPAC. StemExpress has also sponsored NAF trade shows. StemExpress is a Limited Liability Company organized and headquartered in California.

18.     Defendant Kamala Harris is the junior U.S. Senator from California and was Attorney General of California from 2011 to 2017. Harris is sued only in her personal capacity. Harris is a resident of California.

19.     Defendant Jill Habig was a political attaché in Defendant Harris' executive staff and served as Special Assistant Attorney General and Special Counsel to the Attorney General from 2013 to 2016. From 2016 to 2017, Habig served as Harris' campaign manager for U.S. Senate. Habig is sued only in her personal capacity. Habig is a resident of California.

20.     Defendant Brian Cardwell is a California Department of Justice Agent. Cardwell is sued in his personal capacity. Cardwell is a resident of California.

21.     Defendant Reye Diaz is a California Department of Justice Agent. Diaz is sued in his personal capacity. Diaz is a resident of California.

22.     The names and capacities of Defendants named herein Does 1 through 10 are unknown or not yet confirmed. Plaintiffs are informed and believe and thereon allege that each of the Doe defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiffs' damages as herein alleged were proximately caused by their conduct. Plaintiffs will ask leave to amend this Complaint to show the true names and capacities of each Doe Defendant at such time as the same has been ascertained. Plaintiffs allege on information and belief that Defendants, and each of them, were agents of each other, and that each defendant gave consent to, ratified, and/or authorized the conduct of each other defendant.

## FACTUAL BACKGROUND

### The Proud American History of Undercover Investigative Journalism

23.     "Investigative journalism has long been a fixture in the American press." *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1189 (9th Cir. 2018) ("*ALDF v. Wasden*") (citing Brooke Kroeger,[1] *Undercover Reporting: An American Tradition*, IRE J. 20 (Spring 2014)).

24.     "[O]ver and over again, 'going undercover' has proved to be an indispensable tool in the high-value, high-impact journalism of changing systems and righting wrongs." BROOKE KROEGER, UNDERCOVER REPORTING: THE TRUTH ABOUT

[1] Professor of Journalism at NYU's Arthur L. Carter Journalism Institute.

DECEPTION 8 (2012). "[U]ndercover reporting has also been at the forefront of important published and broadcast efforts to create awareness, correct widespread misconceptions, provoke outrage, and give a human face—whether that face inspires horror or compassion or a little of both—to any number of institutions and social worlds that otherwise would be ignored, misunderstood, or misrepresented for lack of open access." *Id.* at 8–9. "Like almost no other reportorial approach, setting out deliberately to fool some of the people at least some of the time has repeatedly produced important, compelling and—this might be the key to the method's enduring popularity—often riveting results." *Id.* at 9.

## California's Surreptitious Recording Regime

25. In 1872, the California Legislature passed former Cal. Penal Code § 640, which prohibited the tapping of telephone or other communication lines, except with the consent of one of the participants—making California a "one-party consent" jurisdiction with respect to recording telephone conversations.

26. In 1941, the California Legislature passed former Cal. Penal Code § 653h, which prohibited installing a dictograph—a hidden microphone transmitting sounds to another place—in a "house, room, apartment, tenement, office, shop, warehouse, store, mill, barn, stable, or other building, tent, vessel, railroad car, vehicle, mine or any underground portion thereof" without the consent of the owner/lessee of the property.

27. In 1963, the California Legislature passed former Cal. Penal Code § 653j, which prohibited generally recording the conversations of others unless at least one party to that conversation consented.

28. Former Section 653j, however, only applied to a "confidential communication," defined as follows: "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in any legislative, judicial, executive, or administrative

proceeding open to the public, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded."

29.     Finally, in 1967, the California Legislature replaced former Sections 640, 653h, and 653j, with a comprehensive Invasion of Privacy Act, located at Cal. Penal Code § 630, et seq. The California Legislature determined that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications." Cal. Penal Code § 630.

30.     According to the California Legislature, generally the Invasion of Privacy Act converted California from a "one-party consent" jurisdiction, to a "two-party consent" jurisdiction. The Legislative Counsel's Digest states: "With respect to recording …, prohibits such acts by any person so acting without consent of all parties to the communication, rather than limiting the prohibitions to persons . . . acting without the consent of any party to the communication." Other aspects of prior law, however, were carried over into the new Invasion of Privacy Act.

31.     One such aspect was the limitation of the statute to not apply in public gatherings. Both former Section 653j(c) and current Section 632(c) include the same definition of a "confidential communication."

32.     Further, in light of the conversion of California to a "two-party consent" jurisdiction, the California Legislature felt the need to add a new Section 633.5. According to a summary from a California legislator, Section 633.5 maintains the "one-party consent" rule if the recording is "reasonably believed to be necessary in investigation of crimes." As stated by the Legislative Digest, under Section 633.5, the focus is on the *purpose* of the recording, and "private citizens may legally record a confidential communication if they reasonably believe it to be necessary in furtherance of an investigation into the crimes of extortion, kidnaping, bribery, any

---
7
COMPLAINT

violent felony to the person, or lewd or annoying phone calls."[2]

33.     Section 633.5 recognizes a protected purpose for surreptitious recordings in California. Since its passage, courts and the government have consistently understood Section 633.5 as concerning the purpose or motive of the party making the recording. For example, in 1997, the Ninth Circuit affirmed the grant of a defense motion for summary judgment on the following basis:

> Even if Mr. Lipset might have reason to be skeptical of Mrs. Merdita's account, he had no reason to doubt that recording her conversations with Mrs. Gensburg would "relate to" the commission by Mrs. Gensburg of the crime of extortion. It might relate by proving Mrs. Gensburg innocent, by proving her guilty, or by being indeterminate, but however the evidence turned out, it would be precisely for this statutorily permitted *purpose*.

*Gensburg v. Lipset*, No. 94-16939, 1997 U.S. App. LEXIS 16276377, at *8-9 (9th Cir. June 30, 1997) (italics added).[3] Two years later, the California Attorney General issued an opinion, stating that "there is no violation of the Act's provisions if the recording is made for a proper *purpose*." 82 Cal. Op. Att'y Gen. 148, No. 99-403, 1999 WL 566799 (1999) (italics added).

34.     The California Supreme Court explicitly endorsed the purpose-based exception to the two-party consent rule in the 1991 case *Lubetzky v. State Bar*, and every California case applying the Penal Code section 633.5 defense also endorses this rule. *See, e.g.*, *People v. Parra*, 165 Cal. App. 3d 874, 880 (1985) ("[The defendant's] testimony of why he recorded the appellant's voice was sufficient to except that recording from the prohibition of section 632.") (emphasis added); *People v. Baker*, 88 Cal. App. 3d 115, 123 (1978) (verbal evidence of potential extortion sufficient to permit recording of confidential communication); *People v.*

---

[2] Under California law, Section 632 and 633.5 should be read together, and not as if Section 633.5 were an exception or defense to Section 632. *See Ex parte Hornef*, 154 Cal. 355, 359–60 (1908); *People v. Gott*, 26 Cal. App. 4th 881, 886 (1994).

[3] Plaintiffs cite this opinion solely as historical background.

*Suite*, 101 Cal. App. 3d 680, 688–689 (1980) (university bomb threat permitted university to record "all incoming calls on their two emergency lines" in order to potentially gather evidence of criminality).

35.     Minor amendments to California's Invasion of Privacy Act have been made at least half-a-dozen times in the following years. But the next significant change did not occur until the "Planned Parenthood Amendment" of 2016, which in the wake of Plaintiffs' publications about the trade in aborted fetal organs and tissues added Cal. Penal Code § 632.01, which law prohibited the publication of any "confidential communication" of a health care provider obtained in a manner that violated California Penal Code § 632.

**California Does Not Prosecute Newsgathering Under Its Recording Regime**

36.     California is no stranger to undercover journalism methods that involve surreptitious recording. Both citizen journalists as well as journalists working for large news gathering companies have conducted undercover investigations repeatedly and openly in California.

37.     For example, in 2008, NBC4 Los Angeles sent two reporters to work undercover as janitors for eight months at a Los Angeles elementary school and recorded other janitors falsifying records of flushing fountains daily to protect children from lead exposure.[4] The other janitors depicted did not consent to the recordings, and on information and belief, numerous recordings were made in settings where conversations with other janitors could not be overheard. NBC4 published its findings and video evidence on the evening news and even received an Investigative Reporters and Editors award for their publication, which they entitled, "Contaminated Water." California did not prosecute the two reporters, Joel Grover and Matt Goldberg.

---

[4] *See* Grover, Joel et al., "Contaminated Water," KNBC – Los Angeles, April 24, 2008, http://sites.dlib.nyu.edu/undercover/sites/dlib.nyu.edu.undercover/files/documents/uploads/editors/Contaminated-Water_KNBC_24Apr2008_0.pdf.

38.     Similarly, in 2012, a PETA investigator worked undercover at GCB, a company that bred and sold reptiles and rats in Lake Elsinore, California.[5] The PETA investigator recorded some of the company's workers without their consent, including its manager, neglecting thousands of animals, many of them to death. On information and belief, conversations with these workers could not be overheard. PETA widely published the reports, but California did not prosecute the PETA investigator. On the basis of PETA's widely reported investigation, the Riverside County District Attorney prosecuted several of the targets of the undercover investigation, including owners of the company.

39.     In 2019, CBS Los Angeles sent reporters undercover at three pet stores in Santa Ana and San Diego County and recorded purebred or designer puppies being sold, months after AB 485 was passed prohibiting the sale of puppies, cats, or bunnies unless they come from a shelter or rescue organization.[6] The investigators recorded pet store staff without their consent, and on information and belief, conversations with these workers could not be overheard. CBS Los Angeles published results of its investigation on the evening news, but California did not prosecute the reporters from CBS LA.

40.     These examples are only a few of the undercover investigations that have occurred in this state, but the State of California has not prosecuted any of these other undercover journalists for their undercover investigations.

**Daleiden's and CMP's Newsgathering Efforts in California**

41.     In 2010, while working for an investigative journalism organization, Mr. Daleiden first learned of the allegations of violent crime relating to the supply chain of aborted fetal organs and tissues for experimentation. He reviewed news stories by

---

[5] *See* https://www.peta.org/features/rat-snake-investigation-california-dealer-warehouse/

[6] *See* "2 On Your Side: Undercover Investigation Reveals Loophole in 'Puppy Mill Ban Law'," CBS Los Angeles, April 30, 2019, https://losangeles.cbslocal.com/2019/04/30/puppy-mill-loophole-rescue-dogs/

other journalists who went undercover in the guise of a company in the fetal marketing industry to investigate and report on the fetal tissue market. *See* ABC News 20/20, *Parts for Sale*, YOUTUBE (Mar. 8, 2000), https://youtu.be/mltRMb5GDKE. The news stories revealed that fetal organs and tissues were a profitable market, and tissue procurement companies supplied abortion providers with instruments to modify the abortion procedure to "harvest" higher quality and more valuable intact fetal parts destined for profitable sale.

42. Mr. Daleiden also reviewed a 2000 Congressional investigation into the fetal tissue market,[7] interviewed a Planned Parenthood former clinic director, and studied scientific literature and other reports on the experimental use of aborted fetal tissue and the process involved in obtaining fetal tissue that was intact enough for scientific experiment.

43. After this and other research over several years, Mr. Daleiden concluded that major abortion providers such as PPFA, its affiliates, NAF and its members, and companies like StemExpress were participating in the trafficking of fetal tissue against the law, including transferring fetal tissue for valuable consideration, making nonconsensual and experimental changes to patients' abortion care, and committing partial-birth abortions and infanticide. On the basis of his research, Mr. Daleiden decided to conduct a thorough and thoughtful investigative journalism study using undercover video recording specifically for the purpose of gathering evidence of these violent crimes.

44. In January 2013, Mr. Daleiden founded CMP for investigative reporting on bioethical issues. CMP's first major investigative project was to be a long-term, in-depth undercover journalism study to document and report on the procurement, transfer, and sale of aborted fetal tissue by major abortion providers such as PPFA,

---

[7] See Fetal Tissue: Is it Being Sold in Violation of Fed. Law?: Hearing Before the Subcomm. on Health and Env't of the H. Comm. on Commerce, 106th Cong. 54–56 (2000) (testimony of Dean Alberty, Jr.).

1   its affiliates, and NAF, and tissue procurement companies such as StemExpress,

2   Advanced Bioscience Resources (ABR), and others. For undercover video recording,

3   the investigation utilized the journalistic technique of placing reporters undercover in

4   the fetal tissue market to record prospective business conversations and to explore

5   the marketplace and attitudes among marketplace participants. This journalistic

6   technique is a common technique practiced by citizen and professional journalists

7   throughout history.

8        45.    As part of the uncover investigation, CMP formed a start-up tissue

9   procurement company named BioMax Procurement Services, LLC (BioMax) in

10  October 2013, and Mr. Daleiden and other CMP investigators started to network

11  within the professional abortion industry as representatives of BioMax.

12       46.    From 2013 to mid-2015, Mr. Daleiden and the undercover investigators

13  he hired through CMP used undercover video to record conversations about

14  harvesting fetal tissue for experimentation, including the kinds of payments,

15  abortions, and fetuses that would have to be involved, with many upper-level

16  leadership representatives of Planned Parenthood, NAF, StemExpress, and similar

17  entities. As a veteran of investigative journalism, including specifically in California,

18  Mr. Daleiden, CMP, and their colleagues were careful to record California

19  conversations in places of public accommodation where third parties were present

20  and could overhear. Additionally, Mr. Daleiden, CMP, and their colleagues made

21  their recordings in California with the express purpose to gather evidence of violent

22  crimes.

23       47.    Mr. Daleiden and CMP recorded many shocking and concerning

24  admissions from the abortion industry and fetal-parts-trading leadership with whom

25  they met. In June 2013, Mr. Daleiden had a conversation at a stem cell trade show

26  with Perrin Larton, the Procurement Manager of ABR, who told him that while

27  generally the goal of her abortion providers was "not to have a live birth," in some

28  harvesting cases she had seen the fetus "just fall out" of the patient after only 3

minutes in the operating room. Mr. Daleiden, based on his own experience and understanding of the abortion industry and in the context of the conversation, understood Ms. Larton to be describing the occurrence of fetuses being delivered alive from abortion patients, prior to attempts to terminate the fetus. A few months later, CMP investigators met with Dr. Katharine Sheehan, the longtime medical director of Planned Parenthood in San Diego, California, who told them her Planned Parenthood affiliate had been working with ABR for over 10 years.

48.     In 2014, Mr. Daleiden met with another abortion provider who was at that time the Senior Director of Medical Services for Defendant PPFA, who stated that she herself harvested fetal tissue from late-term abortions at Planned Parenthood Los Angeles and that she could use ultrasound guidance to change the fetus to a feet-first "breech" presentation, in order to pull the fetus out intact to harvest better heart, lung, liver, and brain specimens.

49.     Mr. Daleiden also met with the longtime medical director of Planned Parenthood Los Angeles, who advised using a "less crunchy technique" of manual instead of electrical suction to get intact fetal tissue from abortions. Both providers confirmed that fetal tissue should be priced "per specimen", and one provider joked, "I want a Lamborghini."

50.     Mr. Daleiden also met and discussed fetal tissue harvesting with Dr. DeShawn Taylor, who had also worked at PPLA, and Dr. Jennefer Russo, at the time the medical director of Planned Parenthood of Orange & San Bernardino Counties. Dr. Taylor suggested using labor induction to deliver intact fetuses for organ harvesting, and stated that when it came to addressing signs of life in the fetus after delivery, "You gotta pay attention to who's in the room." Dr. Russo identified DaVinci Biosciences, LLC as the company to which PPOSBC provided fetal tissue, and she commented on the method of changing the fetus' presentation, stating that, "We like to do that too" and that "we try" to provide intact fetuses. Dr. Russo stated that due to a shortage at that time, PPOSBC was not using the drug digoxin to kill the

fetus before doing the abortions.

51.     Mr. Daleiden and CMP also met with the founder of StemExpress, who stated that the company frequently obtained intact fetuses and shipped them back to the StemExpress laboratory "in its entirety." Mr. Daleiden obtained StemExpress advertisements, endorsed by a California Planned Parenthood medical director, advertising "financial profits" and "fiscal growth" to abortion clinics that worked with StemExpress.

52.     Throughout the undercover investigation and beginning in October 2013, Mr. Daleiden communicated with the late Holly O'Donnell, a procurement technician at StemExpress from December 2012 to April 2013, who procured tissue for StemExpress in multiple Planned Parenthood clinics in California. Ms. O'Donnell stated she observed aborted fetuses with hearts that were still beating and that StemExpress sometimes took fetal tissue without patient consent, and she provided documentation that StemExpress paid bonuses based on the number of type of fetal organs harvested.

53.     Mr. Daleiden and CMP reported their findings and provided their evidence to multiple law enforcement agencies throughout the undercover project and prior to the public release of any video reports. In September 2014, Mr. Daleiden and CMP made their first report to law enforcement, and through intermediaries provided information to the Maricopa County, Arizona, District Attorney's Office regarding StemExpress, other Arizona tissue procurement organizations, Planned Parenthood, and other abortion clinics. In May 2015, Mr. Daleiden and CMP made a report in person to the El Dorado County Sheriff's Office about the evidence of violent crimes at StemExpress, Planned Parenthood, and NAF clinics. Mr. Daleiden and CMP also made a report to the Orange County District Attorney's office in June 2015. Between March and July 2015, prior to any public video release, Mr. Daleiden and CMP also made reports to the Attorneys General of Arizona, Texas, Michigan, and Oklahoma, and attempted to provide the evidence from the undercover project to

1   other law enforcement agencies through appropriate intermediaries.

2       54.    On June 24, 2015, David Daleiden attended an in-person meeting with various members of Congress to explain the results of CMP's investigation. At that meeting, Daleiden reported crimes he believed had been committed by PPFA, various Planned Parenthood affiliates, StemExpress, Advanced Bioscience Resources, Novogenix Laboratories, DaVinci Biosciences, and DV Biologics, and explained the need for government oversight and vigorous enforcement of laws and regulations governing the experimental use of aborted fetuses and fetal tissue.

**The Publication of, and Reaction to, CMP's Undercover Videos**

55.    Having successfully obtained damning evidence of wrongdoing in the fetal tissue procurement industry, CMP began publishing its evidence on July 14, 2015. CMP republished the public professional profile information of the individuals investigated, but CMP did not publish personally identifying information such as home contact information. None of CMP's publications called for illegal action or violence in any way. The publications only called for official investigations and legal accountability for the criminal actors involved.

56.    Both government officials and the public responded vigorously to the videos. The very next day, on July 15, 2015, the U.S. House of Representatives Energy and Commerce Committee and Judiciary Committee began investigations into illegal fetal tissue procurement practices. Two weeks later, on August 14, 2015, the House Oversight and Government Reform Committee began its own investigation. Then, on October 7, 2015, the U.S. House of Representatives voted to create a special "Select Investigative Panel" on illegal fetal tissue procurement practices, to consolidate the three House investigations into one. The U.S. Senate initiated its own investigation, conducted by the Senate Judiciary Committee.

57.    On July 27, 2015, in direct response to CMP's undercover videos, Cecile Richards, the CEO of PPFA went on *This Week with George Stephanopoulos* and stated: "But what I really want to make clear, George, is Planned Parenthood has

broken no laws." Nevertheless, the governmental investigations continued apace.

58.     As a result, the defendants engaged in an all-out war to censor and remove the content that CMP had published, and chill future journalistic efforts to investigate the abortion industry and to ensure that the industry complies with all applicable laws.

59.     First, on July 27, 2015, StemExpress—the purchaser of fetal tissue from multiple Planned Parenthood affiliates in California—filed suit against CMP in Los Angeles, California, Superior Court seeking to enjoin the publication of CMP's undercover video of StemExpress and information about its involvement in fetal tissue harvesting with Planned Parenthood. *See* Complaint, *StemExpress LLC, v The Ctr. for Med. Progress*, No. BC589145 (Cal. Super., Jul. 27, 2015). StemExpress was not successful in obtaining its injunction, and ultimately dismissed its claims.

60.     On July 31, 2015, the National Abortion Federation filed a thirteen-count lawsuit in the U.S. District Court for the Northern District of California, also seeking to enjoin CMP from publishing any information or videos from NAF's annual tradeshows. *See* Complaint, *Nat'l Abortion Fed'n v. Ctr. for Med. Progress*, No. 3:15-cv-3522 (N.D. Cal., Jul. 31, 2015), 2015 WL 4591870. NAF was not successful in enjoining already-published videos discussing NAF's involvement in fetal tissue transfers.

61.     On January 14, 2016, PPFA and its California affiliates filed a substantially similar federal lawsuit as the NAF lawsuit against CMP in the U.S. District Court for the Northern District of California, but without seeking an injunction on publication. *See* Complaint, *Planned Parenthood Fed'n of Am. v. Ctr. for Med. Progress*, No. 3:16-cv-236 (N.D. Cal., Jan. 14, 2016), 2016 WL 159573.

62.     On January 15, 2016, the first version of the "Planned Parenthood Amendment" to California's Invasion of Privacy Act., Cal. Penal Code § 632.01, was introduced.

63.     On January 25, 2016, Planned Parenthood secured the indictment of

David Daleiden by a grand jury in Harris County, Texas. The indictment included a misdemeanor charge of offering to purchase body parts and a felony charge of tampering with a driver's license for fraudulent purposes during his undercover investigative efforts. *See* Indictment, *People v. Daleiden*, No. 2071353 (Tex. Super., Jan. 25, 2016). Two judges ultimately dismissed the indictments, and the Harris County ADA in charge of the grand jury was fired.

64.     On April 5, 2016, the California Department of Justice raided Mr. Daleiden's home, and seized his computers used to publish the undercover videos.

65.     On August 31, 2016, the "Planned Parenthood Amendment" was passed by both the California Assembly and Senate. It was signed into law by California Governor Brown on September 30, 2016, and went into effect on January 1, 2017.

66.     On March 28, 2017, AG Becerra filed a criminal complaint against Daleiden, listing fourteen counts of violating Cal. Penal Code § 632, and one count of criminal conspiracy, Cal. Penal Code § 182(a). The fourteen recording counts concerned eight individuals recorded at the NAF 2014 tradeshow held at a hotel in San Francisco, recordings of Planned Parenthood officials at restaurants in Los Angeles and Pasadena, and a recording of StemExpress leadership at a restaurant in El Dorado Hills. The prosecution was assigned to Deputy Attorney General Johnette Jauron.

### Federal and State Investigations into Planned Parenthood

67.     In December 2016 and January 2017, respectively, the U.S. Senate and House investigations published their final reports.[8] Both the U.S. House and Senate investigations concluded that Planned Parenthood had committed systemic violations of the law. *See* SENATE REPORT at 44–53; HOUSE REPORT at 134–35. The House

---

[8] MAJ. STAFF OF S. COMM. ON THE JUD., 114TH CONG., HUM. FETAL TISSUE RES.: CONTEXT AND CONTROVERSY 114-27 (Comm. Print. 2016); SELECT INVESTIGATIVE PANEL OF THE ENERGY & COMMERCE COMM., U.S. H.R., FINAL REP. (2016)

Panel and Senate Committee then issued numerous criminal and regulatory referrals to federal, state, and local law enforcement entities, including for several abortion providers and fetal tissue procurement companies. Both investigative bodies noted that their findings were consistent with CMP's undercover videos, which were "the impetus for" the investigations. *See* SENATE REPORT at 8, 55; HOUSE REPORT at 415.

68.     In December 2016, the Texas Health & Human Services Division issued a Final Notice of Termination to Planned Parenthood, terminating its enrollment in the Texas Medicaid program. According to the Texas HHS, the termination was based on two factors: (1) footage of the BioMax visit to Planned Parenthood's Houston clinic establishing that it would modify procedures in order to sell tissue; and (2) the U.S. House investigation's conclusion that Planned Parenthood had repeatedly lied to it.

69.     In subsequent litigation, a panel of the Fifth Circuit upheld Texas's termination of Planned Parenthood's enrollment in the Texas Medicaid program. As stated by that panel, "based on the [CMP] videos, [] the Provider Plaintiffs at a minimum violated federal standards regarding fetal tissue research and standards of medical ethics by allowing doctors to alter abortion procedures to retrieve tissue for research purposes or allowing the researchers themselves to perform the procedures." *Planned Parenthood of Greater Texas Family Planning & Preventative Health Servs., Inc v. Smith*, 913 F.3d 551, 568 (5th Cir. 2019), *reh'g en banc granted*, 914 F.3d 994 (5th Cir. 2019).

70.     In October 2016, the Orange County, California District Attorney initiated a civil prosecution against the sister companies of DV Biologics and DaVinci Biosciences for illegally re-selling fetal tissue obtained from PPOSBC. *See* Complaint, *The People of the State of California v. DV Biologics, LLC*, No. 30-2016-00880665-CU-BT-CJC (Cal. Super., Oct. 11, 2016).

71.     The Orange County, California, Superior Court ultimately entered judgment in favor of California. As part of a stipulated judgment, the companies

admitted to selling fetal body parts obtained from PPOSBC for valuable consideration against the law, and agreed to a $7.8 million settlement. The Orange County District Attorney's office credited CMP's investigative journalism with prompting the case, stating "In September 2015, the OCDA opened an investigation into DaVinci Biosciences and DV Biologics after a complaint was submitted by the Center for Medical Progress regarding the illegal sale of aborted fetal tissue by both companies."

72.    However, the Attorneys General of California, both current AG Defendant Xavier Becerra and former AG Defendant Kamala Harris, have not meaningfully investigated Planned Parenthood and its associates for fetal tissue trafficking.

73.    Other criminal referrals issued by the U.S. House and Senate investigations remain pending. However, although law enforcement generally refuse to comment on, or even confirm, active investigations – in a rare move, the U.S. Department of Justice confirmed that it had an active investigation based on the referrals made to it.[9]

**Defendants Conspire to Violate Daleiden and CMP's Constitutional Rights**

74.    Since the publication of CMP's videos, Defendants have conspired to suppress Plaintiffs' videos and speech from the public and worked to target Mr. Daleiden for his speech.

75.    PPFA, PPAC, their affiliates, NAF, StemExpress, and the individuals affiliated with the organizations were motivated to suppress CMP videos and CMP and Daleiden's other speech about the Defendants, in order to conceal their involvement in fetal trafficking and silence any critical or scrutinizing speech about their fetal tissue transfers.

---

[9] *See* Fandos, Nicholas, "Justice Dept. Investigating Fetal Tissue Transfers by Planned Parenthood and Others," The New York Times, December 8, 2017 https://www.nytimes.com/2017/12/08/us/politics/planned-parenthood-fetal-tissue-transfers-federal-investigation.html.

76.     As referenced above, PPFA and its affiliates were aware of and involved in altering abortion procedures to obtain more marketable specimens for its tissue procurement partners such as StemExpress, which specimens PPFA and its affiliates transferred for valuable consideration to StemExpress.

77.     Approximately 50% of NAF's Board of Directors and membership consists of Planned Parenthood representatives and affiliates. NAF engaged in a mutually beneficial relationship with StemExpress whereby StemExpress financially sponsored NAF trade shows, and NAF promoted StemExpress to its members and connected StemExpress with sources of fetal tissue.

78.     NAF, PPFA, PPFA affiliates, and StemExpress all had a joint interest in suppressing CMP's videos and chilling any future attempts to investigate the fetal trafficking industry.

79.     After CMP released the first video featuring a PPFA provider's admissions about per-specimen fetal tissue payments, using intact D&E abortions to get whole fetuses, and PPFA's knowledge and approval of these practices, PPFA began communicating with the California Attorney General's office—then led by Defendant Kamala Harris—about Plaintiffs, their undercover videos, and their reporting on the co-conspirators' fetal tissue programs.

80.     On July 17, 2015—three days after CMP released its first video—Kathy Kneer, CEO of Defendant PPAC, emailed a letter to Defendant Harris, and falsely informed her that the California affiliates' fetal tissue transfer programs were legal, falsely stating that the payments the affiliates were receiving were for "administrative and transportation costs," when in fact all transportation was handled by the tissue procurement companies.

81.     On July 21, 2015—the day CMP released its second video in which a senior Planned Parenthood abortion provider admitted that Planned Parenthood "didn't have to do anything" to allow fetal tissue wholesaler Novogenix Laboratories, LLC to come into its clinic and harvest fetal tissue and yet "there was

compensation for this"—Defendant Beth Parker, General Counsel for PPAC, emailed Defendant Jill Habig, Special Assistant to Kamala Harris (a political appointee), again falsely claiming that the California affiliates' fetal tissue transfer programs were legal. In the email, Ms. Parker stated "A second video was released today. We [Planned Parenthood] believe we are fully compliant with all federal and state laws and are investigating the situation. Please feel free to reach out to me if you have any questions or concerns."

82.    On August 6, 2015, outside special counsel for several California Planned Parenthood entities, Matthew Umhofer ("Mr. Umhofer"), brought a senior Planned Parenthood abortion provider to the Pasadena Police Department to file a criminal complaint against Daleiden concerning the recording made of that person and an associate in that city. On information and belief, the provider agreed to file a criminal complaint against Daleiden solely due to the content of the videos and the desire to suppress the content of the videos.  During her police interview, the provider did not complain of any threats resulting from the videos. The provider told the Pasadena detectives concerning Mr. Daleiden: "Vindictive is his middle name, this guy." The provider stated the true motives the co-conspirator Defendants have for seeking to enforce the California video recording law against Mr. Daleiden and Mr. Daleiden alone: "I appreciate your time looking into this, because *if we could brand them as criminals*, that would be a plus for me, I think. Because they've thrown out charges against us that we're criminals" (emphasis supplied).

83.    At the time she made this complaint to the Pasadena Police Department, the provider knew that Planned Parenthood had sold fetal tissue for valuable consideration and knew that the conversation with Mr. Daleiden in Pasadena had been overheard by others present. Defendant PPFA, Defendant PPAC, and the provider knew that the conversation was public and recording it was not a violation of Penal Code § 632, that the report was not being made in good faith, and that the only reason for their report was to try to silence Plaintiffs' speech, yet the co-

1  conspirator Defendants tasked the provider and Mr. Umhofer with making this report

2  anyway. The provider has since admitted under oath that the conversation was not

3  confidential and could have been overheard.

4        84.    The Pasadena City Attorney did not act on the provider's complaint, and

5  the Pasadena Police Department referred the complaint to the Los Angeles County

6  District Attorney's Office. That office also took no action.

7        85.    On or around August 7 through August 10, Supervising Deputy

8  Attorney General Peter Williams in the Financial Fraud and Special Prosecutions

9  unit of Defendant Harris' office, sent an 8-page memo to Nathan Barankin, Harris'

10  Chief Deputy Attorney General, on the subject of prosecuting the "Planned

11  Parenthood Videos." Defendant Harris, Defendant Habig, and the co-conspirator

12  Defendants were already at this time working to deploy Williams' office to prosecute

13  Mr. Daleiden in retaliation for the content of his videos. Defendant Becerra has

14  refused to produce this memo. On information and belief, Williams questioned the

15  viability and good faith of enforcement action against Plaintiffs under Penal Code §

16  632, and continued to believe there was no basis for enforcement, even as Planned

17  Parenthood and the political apparatus of Defendant Harris' executive office

18  continued to press Williams—a civil servant, not a political appointee—to use Penal

19  Code § 632 against Daleiden. Williams left his 15-year career at the Department of

20  Justice in January 2016, at the same time that the investigation of Plaintiffs under the

21  video recording law, long sought by the Defendants, was being pursued.

22        86.    On August 14, 2015, Defendant Habig emailed Larry Wallace,

23  Defendant Harris' appointed Director of Law Enforcement in charge of the Division

24  of Law Enforcement, including the Bureau of Investigation; Gerald Engler,

25  Defendant Harris' appointed Chief of the Criminal Division, in charge of

26  prosecutions; and Nathan Barankin, Defendant Harris' appointed Chief Deputy

27  Attorney General. Defendant Habig provided them with the contact information of

28  the provider who made the police report to the Pasadena Police Department and

stated that Defendant Parker was checking with other providers before sending additional names. Later the same day, Defendant Habig emailed the same individuals with contact information for Heather Saunders-Estes (Ms. Saunders-Estes), at the time the CEO of Planned Parenthood Northern California, one of Defendant StemExpress' suppliers. Defendant Habig falsely stated that Ms. Saunders-Estes "received threats." Special Agent Supervisor (SAS) James Hirt followed up with Ms. Saunters-Estes, who denied reporting any actual threats to her safety.

87.    On August 31, 2015, Ms. Habig emailed Director Larry Wallace and John Marsh, the Assistant Chief of the Division of Law Enforcement over the Bureau of Investigation, asking about the "scope" of the investigation by the Pasadena Police Department. The co-conspirator Defendants were eager for an excuse to use the powers of the Attorney General's office to silence Plaintiffs' speech, and they were frustrated that there was no evidence whatsoever to tie Plaintiffs to threats of violence or vandalism.

88.    On September 2, 2015, Ms. Habig emailed John Marsh and Larry Wallace again, pressing them on what information they had learned from Ms. Saunders-Estes and stating she had "received information about a clinic vandalism incident" in Thousand Oaks, CA. Ms. Habig wrote that "ordinarily an isolated vandalism incident would not be a matter of huge concern but if there are attempts to threaten the safety of clinic personnel or patients, that would of course be a different story." Defendant Habig and the co-conspirator Defendants desperately tried to connect and continue to propound false links between Plaintiffs and alleged incidents of violence at Planned Parenthood clinics.

89.    The same day, on September 2, 2015, Planned Parenthood's attorney Mr. Umhofer brought another provider to the Los Angeles Police Department to make a police report against Mr. Daleiden for recording a meeting with her on July 25, 2014, even though Defendant PPFA, Defendant PPAC, and that provider knew the conversation was not confidential and could be overheard. The Los Angeles

Police Department refused to take the complaint because "due to the area in which [the other provider] was being recorded at (in a public restaurant) the conversation could be easily overheard by other people" and thus was not confidential and the recording was not a violation of Cal. Penal Code § 632.

90.     On September 24, 2015, a pro-Planned Parenthood advocacy arm of The Feminist Majority Foundation emailed Defendant Habig a list of what the Feminist Majority Foundation claimed were "anti-abortion extremist actions immediately preceding and following the release of CMP videos." The email did not provide any examples of either violent acts or statements by Mr. Daleiden or CMP that called for any such violence or dangerous acts whatsoever. Even with help, the co-conspirator Defendants could neither find nor convincingly invent any facts to link Plaintiffs to violent activity, and even their outside political allies could not provide any useful information to them. The Defendants' conspiracy to silence Plaintiffs' speech was growing more desperate.

91.     By October 13, 2015, a desperate Defendant Parker emailed Defendant Habig about how she was advising Planned Parenthood clinics nationwide to file criminal reports against peaceful protesters. Defendant Parker asked Defendant Habig to advise her "if your office thinks we should be doing anything else."

92.     Throughout November 2015, Defendant Habig and Ms. Parker continued to exchange phone calls. On information and belief, the co-conspirator Defendants were frustrated that they could not find a credible reason to silence Plaintiffs' speech and were trying to brainstorm a way to harness the power of California law enforcement to stop Mr. Daleiden and CMP from continuing to speak about what their investigative journalism had uncovered regarding fetal part trafficking involving Defendants.

93.     From the fall of 2015 to the present, Defendant PPFA has knowingly provided Defendant NAF with artificially elevated numbers of "threat" incidents at Planned Parenthood locations. Defendant NAF then takes Defendant PPFA's

concocted, false reporting and uses it to artificially and falsely expand NAF's own reporting of "violence and harassment" at abortion clinics, including using peaceful picketing and prayer activity to pad their numbers. The co-conspirator Defendants then used these contrived numbers to try to sell a false narrative to the public and to California law enforcement alleging that Plaintiffs were responsible for Defendants' own fabricated increase in threats and physical violence to abortion providers.

94.     On December 3, 2015, Defendant Habig connected Defendant Parker with Special Agent Supervisor Michael Casperson (SAS Casperson). Defendant Parker emailed SAS Casperson a Planned Parenthood-constructed chronology of Mr. Daleiden's citizen journalism work. SAS Casperson, in turn, shared the information with Agent Daniel Torres and Agent Jesus Mejia. The three then interviewed Ms. Parker on the phone, during which Ms. Parker instructed the agents that "Planned Parenthood would like the computers used to produce the videos seized." With Defendant Habig's support, Defendant Parker clearly told Agents Casperson, Torres, and Mejia the purpose of the investigation Planned Parenthood was demanding: to stop Plaintiffs from being able to publish their investigative speech. Agents Casperson, Torres, and Mejia did nothing to prevent the developing conspiracy between Planned Parenthood and the CA Attorney General to selectively apply Penal Code § 632 to silence Plaintiffs.

95.     On January 5, 2016, Agent Torres forwarded the Planned Parenthood-constructed chronology of Mr. Daleiden's citizen journalism work to Deputy Attorney General Cyrena Shirley, the prosecutor assigned to investigate Mr. Daleiden after Peter Williams left the office. On January 7, 2016, Agents Torres and Mejia interviewed the providers who had filed the disregarded reports at the Pasadena and Los Angeles Police Departments, at the offices of Attorney Umhofer. Agents Torres and Mejia knew that the providers' conversations with Plaintiffs at the restaurants were not confidential because they had been overheard by many others present. Then, on January 22, 2016, Agents Torres and Mejia met with the Los

1   Angeles Police Department to obtain its report documenting its determination that it
2   would not take the second provider's complaint because the recording did not violate
3   Cal. Penal Code § 632. Again, knowing that there was no underlying violation of the
4   California video recording law, and that the co-conspirators were engaged in a sham,
5   selective application of the law solely to silence the Plaintiffs' free speech, the
6   Agents nevertheless did nothing to prevent or help prevent the conspiracy.

7       96.    On January 15, 2016, the first version of the "Planned Parenthood
8   Amendment" to California's Invasion of Privacy Act., Cal. Penal Code § 632.01, was
9   introduced. Then, between February and April 2016, Ms. Parker and Ms. Habig
10  began working closely on it, preparing revisions to it.

11      97.    On March 8, 2016, Defendant Parker emailed Defendant Habig seeking
12  reinforcement of her and Planned Parenthood's control of the prosecution. In that
13  respect, she complained about not being informed that the prior assigned prosecutor
14  had left his position, and that the case was now assigned to Deputy Attorney General
15  Cyrena Shirley. Defendant Parker also asked to participate in the witness interview
16  with Dr. Jennefer Russo of PPOSBC. That same day, Defendant PPAC's then-CEO,
17  Kathy Kneer, emailed Defendant Habig to set up an in-person meeting with
18  Defendant Harris. The meeting was to include PPAC's Ana Sandoval, Sue Dunlap
19  and Celinda Vazquez from PPLA, Sheri Bonner from Planned Parenthood Pasadena,
20  and Dr. Russo, all as representatives of Defendant PPAC.

21      98.    On March 15, 2016, Agent Casperson interviewed Dr. Russo by phone
22  with Defendant Parker on the line as well, and Dr. Russo became a witness in the
23  criminal investigation. At the same time, Planned Parenthood and the Attorney
24  General's office were attempting to include Dr. Russo in their in-person meeting
25  with Defendant Harris, and the Orange County District Attorney's office was
26  investigating PPOSBC's business partners DaVinci Biosciences and DV Biologics
27  for the criminal sale of fetal tissue provided by Dr. Russo.

28      99.    On March 23, 2016, Defendant Harris and Defendant Habig met in

person with several representatives of Defendant PPAC at the Attorney General's office in Los Angeles. At this meeting, Defendants discussed Planned Parenthood's political agenda in the state of California, and within this discussion provided false information to Defendant Harris about Mr. Daleiden and CMP's videos and speech, in order to lobby Defendant Harris to apply Penal Code § 632 to silence Mr. Daleiden and CMP's speech. At the time of the meeting, the patronage relationship between Defendants PPAC and PPFA with Defendant Harris was longstanding. PPFA is one of the top twelve campaign contributors to Defendant Harris, donating over $80,000.00 in direct campaign contributions to Defendant Harris' political campaigns for Attorney General and Senator, along with other abortion lobbying groups. It was because of their special relationship, rather than the elements of Penal Code § 632, that the Defendants sought to punish the content of Plaintiffs' speech and attempt to silence it.

100.   On March 28, 2016, Defendant NAF communicated with Agent Torres to encourage the co-conspirator's selective enforcement of the California video recording law. Defendant NAF's Communications Director, Melissa Fowler, gave false information to Agent Torres about NAF's 2014 trade show in San Francisco. Defendant NAF falsely told the Attorney General's office that all conversations at the trade show were private and confidential. Fowler has testified under oath that NAF attendees were on notice in 2014 that they could be filmed at the trade show, that cameras were visibly present in the crowded trade show, and that participants' conversations could be easily overheard in the exhibit hall and breakout rooms of the conference. Defendant NAF made these false statements to law enforcement in order to support the co-conspirator Defendants' selective application of Penal Code § 632 against the Plaintiffs in order to silence their speech.

101.   On April 5, 2016, the California Department of Justice raided Mr. Daleiden's home, effecting Ms. Parker's earlier instructions that "the computers used to produce the videos [be] seized." That same day, Defendant Habig emailed Planned

Parenthood a list of 8 "Action Items" from the March 23 meeting.

102.   The search warrant for the raid on Daleiden's home was issued under Cal. Penal Code § 632, as well as Cal. Pen Code § 182 (conspiracy to commit a crime), Cal. Penal Code § 115(a) (concerning filing a forged instrument, *i.e.*, the BioMax articles of incorporation), and Cal. Penal Code § 470a and Cal. Veh. Code § 4463(a)(1) (both concerning fraudulent use of counterfeit driver's licenses). Defendant Reye Diaz signed the search warrant affidavit for Mr. Daleiden's home.

103.   The issuance of this search warrant caused controversy among career agents in the California Department of Justice. The members of that team tasked with investigating, preparing, and serving the search warrant, including Defendants Cardwell and Diaz, believed the warrant was not supported by probable cause, was not being sought in good faith, and should not issue. One Special Agent ended up taking a leave of absence due to stress, and Agent Donohue left the California Department of Justice. Nevertheless, neither Defendants Cardwell or Diaz did anything to prevent or help prevent the conspiracy to deprive Plaintiffs of their First and Fourteenth Amendment rights from being realized. To the contrary, they both participated directly in the conspiracy.

104.   On May 24, 2016, the head of Defendant StemExpress was interviewed by Defendant Cardwell. Through its head, Defendant StemExpress made false statements to Defendant Cardwell about StemExpress leadership's conversation with Plaintiffs in the Sacramento area that was video recorded. StemExpress falsely represented to Defendant Cardwell that the conversation was confidential, knowing instead that it had been overheard by many others present, with others so close that StemExpress's general counsel accidentally bumped a nearby stranger while talking with Plaintiffs. Defendant StemExpress made these false statements to Defendant Cardwell in order to promote the co-conspirator Defendants' selective prosecution to silence Mr. Daleiden and CMP.

105.   On November 8, 2016, AG Harris was elected to the U.S. Senate, and

1   left her position as the California Attorney General on January 3, 2017. On January

2   24, 2017, the California Legislature accepted Governor Brown's appointment of

3   Xavier Becerra as California Attorney General.

4       106.   On March 28, 2017, AG Becerra filed a criminal complaint against

5   Daleiden, listing fourteen counts of violating Cal. Penal Code § 632, and one count

6   of criminal conspiracy, Cal. Penal Code § 182(a). The fourteen recording counts

7   concerned eight individuals recorded at the NAF 2014 tradeshow in San Francisco,

8   and the recordings at locations in Los Angeles, Pasadena, and Sacramento. The

9   prosecution was assigned to Deputy Attorney General Johnette Jauron. Defendant

10  Cardwell signed the arrest warrant affidavit for Mr. Daleiden.

11      107.   On August 20, 2018, Mr. Daleiden filed a motion to dismiss the

12  prosecution as a constitutionally invalid invidious selective prosecution. Mr.

13  Daleiden argued that never before had Cal. Penal Code § 632 been applied to

14  criminally prosecute undercover video reporting for newsgathering purposes, even in

15  cases where a journalist had actually filmed arguably private conversations.

16      108.   In response, on August 31, 2018, Defendant Xavier Becerra, through

17  DAG Jauron, admitted for the first time in public that he was prosecuting Plaintiffs

18  because "several of those recordings were edited to enhance their shock value, and

19  published online," and "as a result of the above, Defendants are culpable to a greater

20  extent" than other journalists. This was the first time Mr. Daleiden had notice from

21  the Attorney General's office of the true purpose of the prosecution. The Superior

22  Court denied the motion, without prejudice to its refiling at a later date.

23  **Mr. Daleiden and CMP Discover Evidence of the Conspiracy**

24      109.   Defendant Xavier Becerra, Defendant PPFA, and other co-conspirator

25  Defendants have actively worked to conceal from Plaintiffs the evidence of their

26  conspiracy to violate civil rights. Immediately after demurrers were filed and

27  adjudicated in the fall of 2017, Mr. Daleiden sought discovery from Defendant

28  Becerra as to how the extremely unusual—indeed, lone in history—prosecution came

to be. Defendant Becerra resisted the discovery requests and produced documents only slowly, haphazardly, and in a piecemeal fashion. On top of that, the productions were riddled with numerous and extensive redactions making the substance of the Attorney General's email productions impossible to follow.

110.   Throughout the first part of 2018, Mr. Daleiden continued to press for intelligible discovery from Defendant Becerra.

111.   When Mr. Daleiden sought the notes and recordings made by the Special Agent investigators to back up their Investigative Reports, Defendant Becerra astonishingly claimed that no such notes whatsoever existed. On information and belief, one or more of the notes, recordings, and other memorialization of the Bureau of Investigation's work on this case were destroyed in order to cover up the co-conspirator Defendants' violation of Plaintiffs' civil rights.

112.   In the summer of 2018, Plaintiffs also first obtained documents from Defendants PPFA and NAF showing how the Defendants had falsely and artificially inflated the number of so-called "security incidents" at their clinics in order to fabricate a narrative of Plaintiffs' speech as violent and dangerous.

113.   On October 5, 2018, Daleiden moved to dissolve the publishing injunction entered in the lawsuit *Nat'l Abortion Fed'n v. Ctr. for Med. Progress*, No. 3:15-cv-3522 (N.D. Cal., Jul. 31, 2015). Daleiden argued that the pending criminal prosecution superseded the injunction. Further, because the prosecution was initiated by a complaint on information, and not an indictment, a Preliminary Hearing would be held, and he needed the ability to use enjoined materials in that hearing. In response, NAF's lead attorney Derek Foran argued that no action was needed by the District Court because Defendant National Abortion Federation would ensure that the Superior Court sealed the materials:

> FORAN: *There is going to be motion practice over this. I guarantee it,*
> *100 percent. The attorney general's going to move for a protective*
> *order* with respect to the discrete number of videos that are subject to

this Court's injunction that are in any way relevant in the criminal case. *That's going to happen in advance of the preliminary hearing. <u>NAF is going to be heard</u> on that motion. I can guarantee the Court that. <u>We will go in.</u>* There's going to be certain restrictions that the attorney general's going to seek with respect to the manner and mode and means in which this material is published in court. *And the attorney general is going to seek a prohibition* on David Daleiden turning around and making another preview video—

JUDGE ORRICK: So, what you're telling me is that maybe this problem will be addressed—

FORAN: That's exactly right. The Court may never have to deal with anything because *it's going to be put in front of Judge Hite. I guarantee it.*

Foran's confident guarantees to a federal judge of what the Attorney General of California would do on PPFA's and NAF's behalf at a future criminal hearing, shocked Plaintiffs. These guarantees provide further insight into how Defendant NAF and Defendant PPFA closely directed and oversaw Defendant Becerra's selective prosecution throughout the process, going to far as to leverage, in advance, the Attorney General's "guaranteed" actions in a civil proceeding by a different court.

114.   The Attorney General dutifully followed Defendant NAF's direction, and on December 20, 2018, filed a motion to prevent the public from seeing video evidence presented at Daleiden's forthcoming public preliminary hearing.

115.   On January 22, 2019, Defendant NAF sent an extraordinary letter to the Superior Court titled "Nonparty NAF's Statement in Support of Sealing Confidential Materials Subject to Federal Preliminary Injunction." The Superior Court issued an order rejecting the letter, and the same day, DAG Jauron sent the Court a request for reconsideration of the propriety of NAF's letter brief.

116.   On January 25, 2019, Planned Parenthood filed its own letter brief, seeking to formally intervene in the criminal prosecution. On February 11, 2019, DAG Jauron told the Superior Court at a hearing that she believed the third parties

had a right to intervene.

117.   On January 28, 2019, the Superior Court addressed DAG Jauron's insistence that Defendant NAF and PPFA's positions be adopted *in toto* in order to prevent information being revealed at the Preliminary Hearing about their fetal tissue programs: "that is up to the discussion between the AG and whether they want to proceed and whoever they're proceeding on behalf of."

118.   On February 14, 2019, the Superior Court denied the motions to intervene, but granted Planned Parenthood the right to file briefs and be heard under Marsy's Law. It also granted much of the relief Planned Parenthood sought, and began relying on evidence submitted only by Planned Parenthood—not the Attorney General. The Superior Court denied NAF's motion to intervene, and held that it could not be heard under Marsy's Law, but also granted the relief *it* requested— limiting Mr. Daleiden's actions and statements to defend himself at the Preliminary Hearing based on the preliminary injunction entered in the lawsuit *Nat'l Abortion Fed'n v. Ctr. for Med. Progress*, No. 3:15-cv-3522 (N.D. Cal., Jul. 31, 2015).

119.   On May 13, 2019, Mr. Daleiden was contacted by an attorney, Jason Davis, who on information and belief represents one of the California Department of Justice agents. Davis provided Mr. Daleiden with excerpts from an intake report about the Special Agent Defendants. The Special Agent Defendants believed the warrant was not supported by probable cause, was not being sought in good faith, and should not issue. One Special Agent ended up taking a leave of absence due to stress.

120.   A Preliminary Hearing was held between September 3 and 18, 2019. During the pendency of that Preliminary Hearing, Planned Parenthood repeatedly lied to the press about the contents of CMP's exposé.

121.   At the Preliminary Hearing, Defendant Cardwell testified that when he was tasked by Defendant Becerra to investigate the undercover video footage, he was not given any instructions to investigate the elements of the crime of Penal Code §

632 or its limits drawn by Penal Code §633.5. Defendant Cardwell did not investigate the circumstances of the videos to determine whether or not there was evidence that they were of "confidential communications" under Penal Code § 632. Defendant Cardwell testified that in investigating the case and preparing his affidavit for the arrest warrant for Mr. Daleiden, he did not actually watch any of the undercover videos of the conversations in their entirely. Defendant Cardwell testified that he simply "perused the videos, like fast-forward." Defendant Becerra instructed him simply to identify faces and names of Defendant PPFA and Defendant NAF individuals, in order to plug them into Defendant Becerra's selective and bad faith criminal complaint.

122.   At the Preliminary Hearing, Defendant Becerra, through DAG Jauron, declared falsely that "there is no definition of confidentiality in Penal Code § 632." In fact, Penal Code § 632(c) defines "confidential communication" for the core purposes of the recording law. Defendant Becerra did not even attempt to apply the rule of law in to Daleiden's and CMP's selective prosecution, but instead agreed to lend his law enforcement powers to the political use of the co-conspirator Defendants.

123.   Defendant Cardwell also testified that he did not consider the safe harbor provisions of Penal Code § 633.5 in his investigation. The co-conspirator Defendants actively worked to erase from their investigation and prosecution of Mr. Daleiden any consideration of the elements of Penal Code § 633.5 and the evidence demonstrating his protected purpose in recording under Penal Code § 633.5, with the explicit intent of depriving Plaintiffs of their protections, rights, privileges, and immunities under Penal Code § 633.5.

124.   Following that Preliminary Hearing, the Superior Court dismissed counts 4 and 8 (the NAF tradeshow), 9 (the Los Angeles restaurant), and 12, 13, and 14 (the Sacramento restaurant). Remaining are counts relating to six individuals recorded at the NAF tradeshow and two counts relating to the restaurant meeting in

Pasadena.

125.   The Superior Court found "grave concerns with [the] credibility" of Defendant StemExpress after Defendant StemExpress' representative contradicted her sworn declaration from a previous matter on the witness stand at the Preliminary Hearing. On information and belief, the co-conspirator Defendants agreed to give false testimony against Mr. Daleiden at the Preliminary Hearing in order to support the silencing of his speech and the ongoing selective prosecution.

### This Court's Role in Preventing Injustice

126.   Federal courts will abstain from adjudicating a dispute when there are ongoing state criminal proceedings, that implicate important state interests, and provide an adequate opportunity to raise federal defenses. *Cook v. Harding*, 879 F.3d 1035, 1039 (9th Cir. 2018).

127.   Such abstention is "an extraordinary and narrow exception to the general rule that federal courts 'have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.'" *Id*. at 1038. And federal courts will not abstain when the state prosecution was brought in "bad faith." *Younger v. Harris*, 401 U.S. 37, 54 (1971). Such "bad faith" exists when a prosecution is brought in retaliation for, or to chill, constitutionally protected speech. *Cullen v. Fliegner*, 18 F.3d 96, 103–04 (2d Cir. 1994); *Phelps v. Hamilton*, 59 F.3d 1058, 1065 n.12 (10th Cir. 1995); *see also Masterpiece Cakeshop Inc. v. Elenis*, --- F.Supp.3d ---, 2019 WL 8638852, at *10 (D. Colo. 2019) (noting how conspicuous timing was evidence of bad faith).

128.   In a brief filed in the criminal prosecution of Mr. Daleiden on August 31, 2018, DAG Jauron stated that California was prosecuting Plaintiff Daleiden precisely because of the content of his constitutionally protected speech. Nevertheless, the Superior Court has refused to dismiss the made-to-order prosecution. Plaintiffs therefore bring this lawsuit in federal court to vindicate their federal constitutional rights.

# FIRST CLAIM FOR RELIEF

## Free Speech—Overbreadth of Cal. Penal Code § 632

## 42 U.S.C. § 1983

### (by Daleiden and CMP against Becerra)

129.   Plaintiffs incorporate by reference all allegations contained in the above paragraphs.

130.   Cal. Penal Code § 632 is unconstitutional on its face under the First Amendment.

131.   A statute that prohibits substantially more speech than the First Amendment permits is unconstitutionally overbroad even though the State could lawfully punish some of the conduct targeted by the statute. *See United States v. Stevens*, 559 U.S. 460, 473 (2010); *Animal Legal Def. Fund v. Wasde*n, 878 F.3d 1184, 1195 (9th Cir. 2018).

132.   The act of image capture—the recording of audio or video—is not only a necessary predicate to certain speech, it is speech itself. As a result, there is a First Amendment right to film matters of public interest. *See ALDF v. Wasden*, 878 F.3d 1184, 1203–05 (9th Cir. 2018).

133.   Even if the State may be able to lawfully limit the creation of certain recordings, Cal. Penal Code § 632 regulates substantially more speech than the First Amendment permits.

134.   Specifically, Cal. Penal Code § 632, has been interpreted to cover communications completely independent of whether their content is substantively "confidential," "private," or "secret"—or of public interest. *Flanagan v. Flanagan*, 27 Cal.4th 766, 774 (2002). Rather, "under section 632 'confidentiality' . . . require[s] nothing more than the existence of a reasonable expectation by one of the parties that no one is 'listening in' or overhearing the conversation." *Id*. at 772–73. Thus, Cal. Penal Code § 632 criminalizes protected speech. Intentionally or not, the law chills and criminalizes the recording of matters of public interest in public places

or places of public accommodation.

135.   Cal. Penal Code § 632 criminalizes not just the protected speech of Plaintiffs, but of any person or group that would seek to record matters of public interest in a similar manner, including other journalists, internet bloggers, whistleblowers, or any person concerned about publicizing matters of public interest.

136.   Because Cal. Penal Code § 632 categorizes so much protected speech as "criminal," it is unconstitutionally overbroad.

137.   Plaintiffs are entitled to an injunction. Defendant Becerra is acting and threatening to act under color of state law to deprive Plaintiffs of their constitutional rights. Plaintiffs will suffer irreparable injury and will continue to suffer real and immediate threat of irreparable injury as a result of the existence, operation, enforcement, and threat of enforcement of the challenged statute. Plaintiffs have no plain, adequate, or speedy remedy at law. Plaintiffs are refraining from further constitutionally protected activities solely for fear of prosecution under the statute.

138.   Plaintiffs are entitled to prospective relief enjoining Defendant Becerra from enforcing Cal. Penal Code § 632 in its entirety because it is facially overbroad or, in the alternative, as applied to Plaintiffs who film matters of public interest in public places or places of public accommodation.

139.   An actual and immediate controversy exists between Plaintiffs and Defendant Becerra. Plaintiffs contend that the challenged statute is unconstitutional. Defendant believes the statute is constitutional. Plaintiffs are therefore entitled to a declaration of rights with respect to this controversy. Without such a declaration, Plaintiffs will be uncertain of their rights and responsibilities under the law.

140.   Plaintiffs are entitled to declaratory relief in the form of this Court ruling that Cal. Penal Code § 632 is unconstitutionally overbroad and unenforceable in any situation or, in the alternative, is unconstitutional as applied to Plaintiffs who film matters of public interest in public places or places of public accommodation.

141.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to

1   declaratory relief and temporary, preliminary, and permanent injunctive relief

2   invalidating and restraining enforcement of Cal. Penal Code § 632.

3   142.   Plaintiffs found it necessary to engage the services of private counsel to

4   vindicate their rights under the law. Plaintiffs are therefore entitled to an award of

5   attorneys' fees pursuant to 42 U.S.C. § 1988.

**SECOND CLAIM FOR RELIEF**

**Free Speech—Content & Viewpoint Discrimination of Cal. Penal Code § 632.01**

**42 U.S.C. § 1983**

**(by Daleiden and CMP against Becerra)**

10  143.   Plaintiffs incorporate by reference all allegations contained in the above

11  paragraphs.

12  144.   Cal. Penal Code § 632.01 is unconstitutional on its face under the First

13  Amendment.

14  145.   The most important function of the First Amendment is to protect

15  against laws that target certain messages or speech because of their "ideas, subject

16  matter, or content." *Police Dept of Chi. v. Mosley*, 408 U.S. 92, 95–96 (1972).

17  146.   "As a general rule, laws that by their terms distinguish favored speech

18  from disfavored speech on the basis of the ideas or views expressed are content-

19  based." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 643 (1994).

20  147.   Together, Cal. Penal Code §§ 632 and 632.01 limit the ability to create

21  images relating to a particular activity: healthcare. A regulation prohibiting the

22  recording or publishing of images or sounds from a certain type of activity—e.g.,

23  criminal activity in the healthcare industry—is content-discriminatory.

24  148.   Even if the speech in question is not generally protected speech—for

25  example, if the speech in question is merely cast as publication of unlawful

26  recordings—the State still may not make a content-based distinction. *R.A.V. v. City*

27  *of St. Paul*, 505 U.S. 377, 380 (1992). That is to say, content-based distinctions are

28  impermissible even for speech that is generally unprotected.

149.   By its plain text, the Planned Parenthood Amendment of 2016, Cal. Penal Code § 632.01, is an explicit content-based regulation. It singles out recordings of the activities of healthcare providers for special, discriminatory treatment.

150.   In addition, the legislative history of the statute, including statements made by the law's sponsors and drafters, make clear that the purpose of the statute was and is to interfere with and suppress the message of pro-life groups. Legislators were targeting the speech and expressive activities of certain individuals for discriminatory treatment.

151.   The law singles out speech about healthcare and limits the ability of activists and journalists to engage in political speech that is of the utmost public concern.

152.   By singling out the healthcare industry for protection against political speech that may be harmful to its profits, the Planned Parenthood Amendment must be treated as a content- and viewpoint-based regulation. In practice, the law ensures that only one side of the debate about certain healthcare facilities is raised.

153.   The Planned Parenthood Amendment, as a content- and viewpoint-based regulation that is neither justified by a compelling interest nor narrowly tailored, violates Plaintiffs' First Amendment rights.

154.   Plaintiffs are entitled to an injunction. Defendant Becerra is acting and threatening to act under color of state law to deprive Plaintiffs of their constitutional rights. Plaintiffs will suffer irreparable injury and will continue to suffer real and immediate threat of irreparable injury as a result of the existence, operation, enforcement, and threat of enforcement of the challenged statute. Plaintiffs have no plain, adequate, or speedy remedy at law. Plaintiffs are refraining from further constitutionally protected activities solely for fear of prosecution under the statute.

155.   Plaintiffs are entitled to prospective relief enjoining Defendant Becerra from enforcing Cal. Penal Code § 632.01 to remedy the deprivations suffered as a result of the violations of their First Amendment rights.

156.   An actual and immediate controversy exists between Plaintiffs and Defendant Becerra. Plaintiffs contend that the challenged statute is unconstitutional. Defendant believes the statute is constitutional. Plaintiffs are therefore entitled to a declaration of rights with respect to this controversy. Without such a declaration, Plaintiffs will be uncertain of their rights and responsibilities under the law.

157.   Plaintiffs are entitled to declaratory relief in the form of this Court ruling that Cal. Penal Code § 632.01 is unconstitutional and unenforceable in any situation.

158.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of Cal. Penal Code § 632.01.

159.   Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

**THIRD CLAIM FOR RELIEF**

**Equal Protection & Due Process—The Daleiden Amendment: Section 632.01**

**42 U.S.C. § 1983**

**(By Daleiden and CMP against Becerra)**

160.   Plaintiffs incorporate herein by reference all other paragraphs of this complaint as if those allegations were set out explicitly herein.

161.   Cal. Penal Code § 632.01 is unconstitutional on its face under the Fourteenth Amendment.

162.   The Equal Protection Clause of the Fourteenth Amendment provides, "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

163.   When a statute is enacted based on improper motives, including animus towards a particular group of people or a particular person, the Equal Protection and Due Process Clauses of the Fourteenth Amendment are violated. *See, e.g.*, *U.S. Dep't*

1 | *of Agric. v. Moreno*, 413 U.S. 528, 534 (1973).

2 |     164.   The motivating purpose behind Cal. Penal Code § 632.01 was animus
3 | towards pro-life groups, and specifically animus towards Plaintiffs.

4 |     165.   There was *no other purpose* behind Cal. Penal Code § 632.01 than to
5 | harm a politically unpopular group and shelter a single, very politically well-
6 | connected industry from public critique.

7 |     166.   Cal. Penal Code § 632.01 targets pro-life groups and serves no rational,
8 | non-animus-motivated purpose. The legislative history of this law is replete with
9 | derogatory and false statements about Plaintiffs.

10 |     167.   Defendant Becerra is acting and threatening to act under color of state
11 | law to deprive Plaintiffs of their constitutional rights. Plaintiffs will suffer irreparable
12 | injury and will continue to suffer real and immediate threat of irreparable injury as a
13 | result of the existence, operation, enforcement, and threat of enforcement of the
14 | challenged statute. Plaintiffs have no plain, adequate, or speedy remedy at law.
15 | Plaintiffs are refraining from further constitutionally protected activities solely for
16 | fear of prosecution under the statute.

17 |     168.   Plaintiffs are entitled to prospective relief against Becerra to remedy the
18 | Equal Protection and Due Process violations, since they intend to investigate and
19 | report on biomedical issues in the future.

20 |     169.   An actual and immediate controversy exists between Plaintiffs and
21 | Defendant Becerra. Plaintiffs contend that the challenged statute is unconstitutional.
22 | Defendant believes the statute is constitutional. Plaintiffs are therefore entitled to a
23 | declaration of rights with respect to this controversy. Without such a declaration,
24 | Plaintiffs will be uncertain of their rights and responsibilities under the law.

25 |     170.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to
26 | declaratory relief and temporary, preliminary, and permanent injunctive relief
27 | invalidating and restraining enforcement of Cal. Penal Code § 632.01.

28 |     171.   Plaintiffs found it necessary to engage the services of private counsel to

vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

## FOURTH CLAIM FOR RELIEF

**Equal Protection & Due Process—Invidious & Selective Prosecution**

**42 U.S.C. § 1983**

**(By Daleiden against Becerra, PPFA, PPAC,**

**Parker, NAF, StemExpress, Harris, and Habig)**

172.   Mr. Daleiden incorporates herein by reference all other paragraphs of this complaint as if those allegations were set out explicitly herein.

173.   42 U.S.C. § 1983 provides citizens with a cause of action against "[e]very person who . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution.

174.   The Equal Protection and Due Process Clause generally prohibit invidious and selective prosecutions, such as prosecutions based on an unjustifiable standard such as race, religion, or other arbitrary classification directed so exclusively against a particular class of persons. *United States v. Armstrong*, 517 U.S. 456, 464 (1996).

175.   Never before has California applied Cal. Penal Code § 632 to prosecute similarly situated journalists, activists, or advocates. Journalists in California have engaged in numerous undercover operations utilizing the same exact techniques that Mr. Daleiden used during the Human Capital Project investigation.

176.   This prosecution was rejected by the LAPD, the Pasadena City Attorney, the El Dorado County District Attorney, and the Los Angeles District Attorney due to the fact that the recordings were of conversations that "could be easily overheard by other people," and therefore there were no legitimate grounds to prosecute Mr. Daleiden.

177.   The purpose of this prosecution is the infringement of Daleiden's First

Amendment rights in order to punish politically disfavored speech. Indeed, the prosecutor's sole criterion to distinguish Mr. Daleiden's video recordings from those of other undercover reporters in California was rooted in the *content* of his video publications, not the time-honored method by which the videos were obtained: "Moreover, several of those recordings were edited to enhance their shock value, and published online along with the victims' personal identifying information. Not surprisingly, the edited videos incited anger and violence both to the victims themselves and to the community at large." In fact, CMP's publications did *not* include personally identifying information—only publicly available professional profile information, mainly of licensed professionals who are required to make that information publicly accessible—nor did the videos call (expressly or otherwise) for violent or illegal action. CMP's publications were thus wholly protected speech.

178.   Defendants, acting under color of state law, exceeded their legal authority and duties by influencing and coercing the manner in which the California Department of Justice Bureau of Investigation agents investigated Mr. Daleiden, and by allowing their decision-making process to be influenced by or controlled by Defendants Planned Parenthood and the National Abortion Federation.

179.   Defendants and Defendants' co-conspirators also knowingly and willfully conspired and/or agreed among themselves to deprive Daleiden of his rights to record evidence of criminality under Penal Code § 633.5 by ignoring this key element of the California recording law, suppressing information about it from magistrates, instructing the California Department of Justice investigators to ignore this element, and knowingly and willfully taking every step in their application of Penal Code § 632 against Mr. Daleiden with complete disregard for the conduct protected under § 633.5.

180.   Defendants Planned Parenthood, their affiliates and employees, utilized illegal means to influence their representatives in government, including but not limited to, falsely denying their clinic's illegal practices, fraudulently concealing

their clinics' and co-conspirators' illegal conduct in their abortion and fetal tissue programs from law enforcement, falsely claiming that their providers were being subjected to threats of physical harm, and falsely claiming Plaintiffs were responsible for such threats.

181.   The private party defendants here used their direct connection and patronage relationships to AG Harris and AG Becerra to commence the underlying prosecution of Mr. Daleiden, seeking to punish the content of Mr. Daleiden and CMP's speech content. Planned Parenthood and other abortion groups have donated tens of thousands of dollars to the political campaigns of AG Harris and AG Becerra and provided significant other political assistance. It was this special patronage relationship and the political interests and viewpoints it was built around, rather than any element of Penal Code § 632 or body of jurisprudence, that led Defendants Harris and Becerra to seek to punish the content of Plaintiffs' speech.

182.   Defendant Planned Parenthood was not content merely to cause the prosecution of Daleiden, but also required that AG Harris and AG Becerra illegally turn the prosecution over to their direct control. Despite violating due process, Planned Parenthood solicited and caused the entire prosecution to be turned over from the supervisory direction of the Attorney General, to the supervisory authority of Planned Parenthood, including specifically its in-house counsel Beth Parker, such that they had and continue to have effective control over all discretionary decision-making authority over it. The right to petition the government does not include the right to puppeteer the prosecution of  another's message based on its content, or to entirely take over the direction of a criminal prosecution to such a degree that your attorneys can confidently and repeatedly guarantee to a judge that the Attorney General is about to do specific acts for your benefit in another legal proceeding.

183.   As a proximate result of the wrongful acts herein alleged, Plaintiffs have diverted and expended substantial resources to address the consequences of Defendants' violation of Daleiden's constitutional rights, thereby suffering pecuniary

loss compensable under 42 U.S.C. § 1983.

184.   Defendants and Defendants' co-conspirators did the acts and things herein alleged pursuant to, and in furtherance of, the conspiracy and the above-alleged agreement. In doing the things herein alleged, Defendants acted with malice, oppression, willfulness, and wantonness with the intent to cause injury to Plaintiffs, thereby warranting an assessment of punitive damages in an amount appropriate to punish Defendants and deter others from engaging in similar misconduct. On this basis, Plaintiffs seek monetary damages from all non-immune parties (all except Attorney General Becerra).

185.   Daleiden is entitled to an injunction. Defendants are acting and threatening to act under color of state law to deprive Daleiden of his constitutional rights. Daleiden will suffer irreparable injury and will continue to suffer real and immediate threat of irreparable injury as a result of the selective prosecution. Daleiden has no plain, adequate, or speedy remedy at law. Daleiden is refraining from further constitutionally protected activities solely for fear of further selective prosecutions.

186.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Daleiden is entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining selective prosecution against Plaintiff Daleiden.

187.   Daleiden found it necessary to engage the services of private counsel to vindicate their rights under the law. Daleiden is therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

## FIFTH CLAIM FOR RELIEF

## Violation of 42 U.S.C. § 1985(3)

## (By Daleiden against Becerra, PPFA, PPAC, Parker, NAF, StemExpress, Harris, and Habig)

188.   Plaintiff Daleiden incorporates herein by reference all other paragraphs of this complaint as if those allegations were set out explicitly herein.

189.   This federal claim for relief is brought against Defendants pursuant to its intentional and willful violations of Daleiden's civil rights under 42 USC § 1985.

190.   42 U.S.C. § 1985(3) provides citizens with a cause of action against private conspiracies to violation constitutional rights. Section 1985(3) provides, in pertinent part, that: "If two or more persons…conspire…on the premises of another, for the purpose of depriving…any person…of the equal protection of the laws, or of equal privileges and immunities under the laws, or for the purpose of preventing or hindering the constituted authorities…from giving or securing to all persons…the equal protection of the laws[;]…the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation…."

191.   The Defendants, and each of them, did conspire with one another for the purpose of depriving, either directly or indirectly, Plaintiff Daleiden, a member of the journalistic and pro-life community, of the equal protection of the laws, and of equal privileges and immunities under the laws.

192.   The Defendants, and each of them, did conspire with one another for the purpose of depriving, either directly or indirectly, Plaintiff Daleiden, a member of his own class of one, of the equal protection of the laws, and of equal privileges and immunities under the laws.

193.   Defendants conspired with those acting under color of state law to inappropriately influence who law enforcement investigated and the very details of how law enforcement conducted its investigations into Mr. Daleiden and CMP, leading to the unprecedented criminal prosecution of Mr. Daleiden in an effort to violate his First Amendment rights.

194.   Defendants and Defendants' co-conspirators also knowingly and willfully conspired and/or agreed among themselves to deprive Mr. Daleiden and CMP of their rights to record evidence of criminality under Penal Code § 633.5, and to prevent or hinder the State of California from protecting these rights, by ignoring this key element of the California recording law, suppressing information about it

45
COMPLAINT

from magistrates, instructing the California Department of Justice investigators to ignore this element, and knowingly and willfully taking every step in their application of Penal Code § 632 against Mr. Daleiden with complete disregard for the conduct protected under § 633.5.

195.   As a result of Defendants' wrongful, discriminatory infringement of Plaintiffs' civil rights, Plaintiff Daleiden has suffered both general and consequential damages in an amount exceeding the jurisdiction of this court, subject to proof at trial, including but not limited to the damage to reputation, property, business, trade, profession and occupation, physical and bodily injury, including but not limited to, anxiety, humiliation, shock, emotional distress, mental anguish and related mental and physical injury, and any and all attorneys' fees, costs and expenses incurred in prosecuting this action.

196.   At the time the defendants engaged in the conduct alleged herein, they were guilty of intentional conduct, conscious disregard of the Plaintiff Daleiden's rights, malice, fraud, and/or oppression. Defendants possessed the full knowledge as to the rights and interests of Plaintiff Daleiden described herein, and Defendants acted in reckless indifference to and with wanton disregard of Plaintiffs' rights in doing the acts described herein. By reason of these acts, Plaintiff Daleiden is entitled to punitive and exemplary damages against the Defendants in an amount according to proof at the time of trial.

197.   Daleiden has been greatly and irreparably damaged by reason of Defendants' conduct, and unless Defendants are enjoined by this court, they will continue their violations of Daleiden's rights, further irreparably harming him.

198.   As a result of the wrongful conduct of Defendants as herein alleged, Daleiden is entitled to a temporary, preliminary and permanent injunction to prevent great and irreparable injury resulting from the infringement and violation of his rights, from the likelihood that he will be unable to respond in damages, and from the difficulty or impossibility to ascertain the exact amount of personal bodily injury and

property damage has, and will in the future, sustain. These ongoing and continuing injuries sustained by Daleiden cannot be fully compensated in damages and Daleiden is without an adequate remedy at law without the imposition of the requested equitable injunctive relief.

199.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff Daleiden is entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining further actions of the conspirators.

200.   Plaintiff Daleiden found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiff Daleiden is therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

**SIXTH CLAIM FOR RELIEF**

**Violation of 42 U.S.C. § 1986**

**(by Daleiden against Defendants Cardwell and Diaz)**

201.   Plaintiffs incorporate herein by reference all other paragraphs of this complaint as if those allegations were set out explicitly herein.

202.   This federal claim for relief is brought under 42 U.S.C. 1986 against the above Defendants pursuant to their neglect and refusal to prevent or aid in preventing the wrongs conspired to be done under section 1985 as alleged in Plaintiffs' Fifth Claim for Relief.

203.   On information and belief, Defendants Cardwell and Diaz ("CA DOJ Defendants") knew and know that Defendants Planned Parenthood, the National Abortion Federation, and their co-conspirators were and are conspiring to target Mr. Daleiden and CMP with content-based, selective application and selective prosecution of Penal Code § 632 in order to silence Plaintiffs' speech. The CA DOJ Defendants also knew and know that the Planned Parenthood Defendants were and are conspiring with the California Attorney General to deprive Mr. Daleiden and CMP of their rights, privileges, and immunities under § 633.5.

204.   The CA DOJ Defendants have done nothing to aid in preventing the

violations of Mr. Daleiden's and CMP's rights through the conspiracy of the other Defendants, even though as eyewitnesses to and instrumentalities of the conspiracy they have the power to aid in preventing its continued fruition.

205.   Plaintiffs first learned of the CA DOJ Defendants' neglect on May 13, 2019.

206.   As a result of the CA DOJ Defendants' wrongful neglect, Plaintiffs have suffered both general and consequential damages in an amount exceeding the jurisdiction of this court, subject to proof at trial, including but not limited to the damage to reputation, property, business, trade, profession and occupation, physical and bodily injury, including but not limited to, anxiety, humiliation, shock, emotional distress, mental anguish and related mental and physical injury, and any and all attorneys' fees, costs and expenses incurred in prosecuting this action.

207.   Plaintiff Daleiden found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiff Daleiden is therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

**SEVENTH CLAIM FOR RELIEF**

**Declaratory Relief—Purpose of Recording Under Sections 632 and 633.5**

**(By Daleiden and CMP against Becerra)**

208. Plaintiffs incorporate herein by reference all other paragraphs of this complaint as if those allegations were set out explicitly herein.

209. "In a case of actual controversy within its jurisdiction . . . any court of the United States may declare the rights and other legal relations of any interested party seeking such declaration …" 28 U.S.C. § 2201.

210. Plaintiff CMP is a group of citizen journalists dedicated to monitoring and reporting on medical ethics and advances. Plaintiff Daleiden is a citizen journalist with more than a decade of experience in conducting investigative research on the abortion industry, and the founder and CEO of Plaintiff CMP. Together Plaintiffs engage in investigative journalism, including undercover work that sometimes

requires surreptitious recording that relies on the "statutorily permitted purpose" of recording conversations that they reasonably believe to "relate [to] proving [the recordee] innocent, by proving her guilty, or by being indeterminate." *Gensburg v. Lipset*, No. 94-16939, 1997 U.S. App. LEXIS 16276377, at *8-9 (9th Cir. June 30, 1997); *see also* 82 Cal. Op. Att'y Gen. 148, No. 99-403, 1999 WL 566799 (1999) (same); Legislative History (same).

211. Since 2015, when CMP published its last exposé, Plaintiffs have refrained from recording surreptitiously in California. Despite previously believing that the Invasion of Privacy Act was clear, and that they were in compliance with it, its clarity has subsequently been erased through threatened and actual civil and criminal litigation by StemExpress, Planned Parenthood, the National Abortion Federation, and the California Attorney General.

212. Plaintiffs are "uncertain and insecure regarding [their] right *vel non* to videotape and audiotape" conversations in compliance with Cal. Penal Code § 633.5. Because doing so is Plaintiffs' business, however, Plaintiffs "will continue to participate in such [recording] activities" in the future, hopefully in compliance with the law. But without declaratory relief regarding the status of the law, the uncertainty creates "a 'brooding presence,' which cast[s] an adverse effect on [their] legitimate interests as [] citizen[s] of the United States." *Fordyce v. City of Seattle*, 55 F.3d 436, 440 (9th Cir. 1995).

213. As explained above, there is at least a "a genuine threat of enforcement of a disputed state criminal statute" because the California Attorney General has in fact brought an enforcement action. *Steffel v. Thompson*, 415 U.S. 452, 475 (1974). The California Attorney General explained that it chose to prosecute Plaintiffs based on the content of their speech, and therefore there is a likelihood that Plaintiffs may be prosecuted again. Plaintiffs intend to continue publishing material that is "edited to enhance [its] shock value" (where such edits are done in fair and industry standard ways), in order to compete in a difficult marketplace. Plaintiffs further intend to

1  continue publishing "personally identifying [but publicly available online, work

2  contact] information" of the individuals investigated. Therefore, there is a likelihood

3  that Plaintiffs could face litigation again in the future.

4       214. Because of Defendant Becerra's admitted and demonstrated purpose to

5  deny the protections of Section 633.5, "the threatened enforcement" of Section 633.5

6  still "implicates First Amendment rights"—namely the right to record—and so "the

7  inquiry tilts dramatically toward a finding of standing." *LSO, Ltd. v. Stroh*, 205 F.3d

8  1146, 1155 (9th Cir. 2000).

9       215. In light of the above controversy, Plaintiffs are entitled to a declaration of

10  rights with respect to this controversy. Without such a declaration, Plaintiffs will be

11  uncertain of their rights and responsibilities under the law.

**EIGHTH CLAIM FOR RELIEF**

**Supremacy Clause: Preemption of Cal. Penal Code §§ 632, 632.01**

**(By Daleiden and CMP against Becerra)**

15       216.   Plaintiffs incorporate herein by reference all other paragraphs of this

16  complaint as if those allegations were set out explicitly herein.

17       217.   Article VI, paragraph 2, of the U.S. Constitution provides, "the Laws of

18  the United States … shall be the supreme Law of the Land … any Thing in the

19  Constitution or Laws of any State to the Contrary notwithstanding."

20       218.   State laws that conflict with or frustrate the purposes of federal laws are

21  preempted.

22       219.   A state law is preempted when it "stands as an obstacle to the

23  accomplishment and execution of the full purposes and objectives of Congress."

24  *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461

25  U.S. 190, 204 (1983).

26       220.   The operation, existence, and enforcement of Cal. Penal Code §§ 632

27  and 632.01 violate the Supremacy Clause because they conflict with federal law by

28  undermining the objectives of the False Claims Act.

221.   Because one of the core purposes of the False Claims Act, 31 U.S.C. §§ 3729 and 3730, is to provide incentives and protections for private persons to surreptitiously uncover fraud against the federal government, Cal. Penal Code §§ 632 and 632.01 are preempted.

222.   In California there is at least one healthcare facility that has a contract with the federal government to provide healthcare services on behalf of the federal government.

223.   Cal. Penal Code §§ 632 and 632.01 drastically undermine the federal goal of discovering fraud against the federal government by criminalizing the very conduct that has produced at least one False Claims Act case in the healthcare industry. More specifically, Cal. Penal Code § 632.01 was passed to protect Planned Parenthood from investigation, even though Planned Parenthood has been the subject of multiple successful False Claims Act cases.

224.   An actual and immediate controversy exists between Plaintiffs and Defendant Becerra. Plaintiffs contend that the challenged statute is unconstitutional. Defendant believes the statute is constitutional. Plaintiffs are therefore entitled to a declaration of rights with respect to this controversy. Without such a declaration, Plaintiffs will be uncertain of their rights and responsibilities under the law.

225.   Plaintiffs are entitled to a judgment declaring that Cal. Penal Code §§ 632 and 632.01 are preempted. Such a declaration is appropriate and necessary in order to determine the rights and obligations of the parties. Plaintiffs are entitled to declaratory relief in the form of this Court ruling that Cal. Penal Code §§ 632 and 632.01 are unconstitutional.

## PRAYER

Plaintiffs ask this Court to enter judgment against Defendants and provide the following relief:

1. A preliminary and permanent injunction forbidding Defendants and any person acting in concert with them from enforcing Cal. Penal Code § 632

against Daleiden for his actions and conduct related to the Human Capital Project investigation;

2. A preliminary and permanent injunction forbidding Defendants and any person acting in concert with them from enforcing Cal. Penal Code § 632.01 against Daleiden for his actions and conduct related to the Human Capital Project investigation;

3. A declaration that any prosecution against Daleiden and CMP for violating Cal. Penal Code § 632 violates Daleiden's and CMP's free-speech rights, due process rights, and equal protection rights;

4. A declaration that any prosecution against Daleiden and CMP for violating Cal. Penal Code § 632.01 violates Daleiden's and CMP's free-speech rights, due-process rights, and equal-protection rights;

5. An award of compensatory damages against Defendants, including but not limited to damages for lost work time, lost profits, expenses cause by Defendants' unconstitutional actions, as well as damages for the humiliation, emotional distress, inconvenience, and reputational damages caused by Defendants' unconstitutional actions;

6. An award of punitive damages in an amount to be determined at jury against Defendants for their unconstitutional actions;

7. An award of nominal damages to each Plaintiff against each Defendant;

8. An award of costs, expenses, and attorneys' fees for this action pursuant to 42 U.S.C. § 1988;

9. An award of pre-judgment and post-judgment interest;

10. An ordering issuing the requested injunctive relief without requiring a bond or other security from Plaintiffs;

11. Any other relief that the Court deems equitable and just under the circumstances.

//

1

## JURY DEMAND

2       Plaintiffs demand a trial by jury of all issues so triable pursuant to Rule 38 of

3  the Federal Rules of Civil Procedure.

4                              Respectfully submitted,

5

6                         /s/ Harmeet K. Dhillon
                            Harmeet K. Dhillon (SBN: 207873)

7                         Gregory R. Michael (SBN: 306814)
                            Dorothy C. Yamamoto (SBN: 306817)

8                         DHILLON LAW GROUP INC.

9                         177 Post Street, Suite 700
                            Tel: 415-433-1700

10                       Fax: 415-520-6593

11                       harmeet@dhillonlaw.com
                            gmichael@dhillonlaw.com

12                       dorothy@dhillonlaw.com

13

14                       Thomas Brejcha, *pro hac vice pending*
                            (IL Bar No. 0288446)

15                       Peter Breen, *pro hac vice pending*
                            (IL Bar No. 6271981)

16                       THOMAS MORE SOCIETY

17                       309 W. Washington St., #1250
                            Chicago, IL 60606

18                       Tel:   (312) 782-1680

19                       Fax:   (312) 782-1887

20                       tbrejcha@thomasmoresociety.org
                            pbreen@thomasmoresociety.org

21

22                       *Attorneys for Plaintiffs*

23

24

25

26

27

28

COMPLAINT